LeAnn J. HANNA, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security, Defendant.

No. C 94–3084–MWB.

United States District Court,
N.D. Iowa,
Central Division.

June 17, 1996.

Ana Maria Martel, United States Attorney's Office, Cedar Rapids, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING COMMISSIONER'S DENIAL OF SOCIAL SECURITY DISABILITY INSURANCE BENEFITS**

Mark S. Soldat, Algona, IA, for Plaintiff.

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................. 379
 A. Procedural Background ................................... 379
 B. Factual Background ...................................... 380
 1. Introductory facts and daily activities ................. 380
 2. Hanna's work and medical history ..................... 381
 3. Vocational expert's testimony ......................... 384
 4. The ALJ's conclusion ................................. 384
 C. The Court's Jurisdictional Basis ........................ 385
II. ANALYSIS ..................................................... 386
 A. The "Substantial Evidence" Standard .................... 386
 B. The Polaski Standard And Subjective Pain Credibility Determinations ........ 387
 C. Relative Burdens Of Proof .............................. 388
 D. Review Of The ALJ's Decision .......................... 388
 1. Hanna's subjective pain complaints .................... 388
 a. Objective medical evidence ......................... 389
 b. Observations of third parties and Hanna's daily activities ............. 390
 c. Treatment for Hanna's impairments ................. 390
 d. Summary of evidence regarding subjective pain complaints ........... 391
 2. The ALJ's hypothetical ............................... 392
III. CONCLUSION .................................................. 393

This social security disability case requires the court to analyze an administrative law judge's ("ALJ") decision to deny a plaintiff disability insurance benefits. At bottom, this case turns on the court's determination of the effect of plaintiff's "power naps." To make this determination, the court must decide whether the evidence in the record as a whole supports plaintiff's allegation that these "power naps" are a physical restriction on her ability to return to her past relevant work. In addition, the court must determine whether the vocational expert's testimony, based upon the ALJ's hypothetical excluding the alleged necessity of these naps, constitutes substantial evidence that plaintiff is not disabled under the Social Security Act.

Specifically, the plaintiff alleges the ALJ improperly discredited her testimony that she needs three or four rest breaks, for a period of thirty to forty-five minutes each, at different times each day and that the ALJ

failed to consider this alleged need in determining that plaintiff could return to her past relevant work and that she was not disabled. On the other hand, the Commissioner argues plaintiff has not met her burden of showing she cannot perform her past relevant work as an office helper or a cashier. Consequently, the court is presented with the arduous task of examining the extensive record which chronicles plaintiff's medical history to determine if the ALJ's decision to deny this plaintiff social security disability insurance benefits is, in fact, a decision supported by substantial evidence in the record as a whole.

## I. INTRODUCTION

### A. Procedural Background

LeAnn Hanna filed an application for disability insurance benefits under Title II of the Social Security Act on March 15, 1993. (Tr. 110–13.). In her application, Hanna alleged she had been unable to work due to her

impairments since February 11, 1993. (Tr. 110.). Her application was denied initially, (Tr. 105–09), and upon reconsideration. (Tr. 89–92.). An administrative hearing was held concerning this matter on January 10, 1994, in Mason City, Iowa, after which the ALJ determined Hanna was not disabled and not entitled to disability insurance benefits on May 4, 1994. (Tr. 28.). Hanna requested review of the ALJ's decision from the Social Security Administration Appeals Council. (Tr. 8–10.). Upon consideration of additional medical evidence, the Appeals Council denied Hanna's request on September 23, 1994, and stated that "the [ALJ]'s decision stands as the final decision of the Secretary in your case." (Tr. 4–6.). Because Hanna subsequently filed her complaint on November 18, 1994, there is no dispute that Hanna's complaint was timely filed with this court. Therefore, Hanna is entitled to a review of her case under 42 U.S.C. § 405(g). The court will now commence its review of the Commissioner's decision in accordance with § 405(g) by determining whether that decision was supported by substantial evidence.

### B. Factual Background

#### 1. Introductory facts and daily activities

The plaintiff in this case is LeAnn Hanna, a 37–year–old woman from Lake Mills, Iowa. Hanna is single and lives in a trailer with her son, age three. (Tr. 47.). She has graduated from high school and has completed one year of college. (Tr. 52.). Hanna alleges she became disabled in February 1993 due to fibromyalgia,[1] shoulder impingement, and signs of wear in two discs in her neck. In addition, Hanna has also been treated for right carpal tunnel syndrome, thoracic back strain, and left wrist tendonitis. Hanna has previously worked as a production assembler, a cashier, an office helper, and a bartender.

(Tr. 283.). At the time of the administrative hearing, she was unemployed, and her sole source of income was derived from unemployment compensation benefits.[2] (Tr. 53, 60).

Regarding her daily activities, Hanna occasionally cooks, shops for groceries, does her own laundry, watches television, and drives to visit friends or run errands. She also cleans her apartment "in spurts," doing "a little bit here and a little bit there." (Tr. 50.). Hanna further testified that she hires people to help her clean and to take care of her yard. (Tr. 50.). Hanna claims her pain has intensified since the birth of her son because of her duties in taking care of him and keeping her trailer clean. (Tr. 47.). To attempt to alleviate this pain, Hanna testified that she lays down and rests at least three or four times a day for thirty to forty-five minutes at a time, at different times each day depending on the level of fatigue she is experiencing and her son's schedule that particular day. (Tr. 48–49.). Prior to the onset of her physical pain and impairments, Hanna used to golf, boat, bowl, and play pinball and darts. (Tr. 47.). At the time of the administrative hearing, Hanna testified that her son weighed fifteen pounds, and she experienced soreness when lifting him and bending over to change his diaper. (Tr. 48.).

Deborah Christenson and Greg Turvold, two of Hanna's friends, testified at the administrative hearing. Both testified that they had witnessed her lying down often and watching television. (Tr. 70, 77.). In addition, Christenson testified that she babysat for Hanna's son when Hanna needed to go out for whatever reason. Also, Turvold testified that Hanna has visited him in his home with her son for two or three hours at a time and has prepared dinner for him in her home on several occasions. (Tr. 75.). Turvold noted that he and Hanna would either meet in

---

1. Fibromyalgia is defined as muscular pain in the fibrous tissues. Stedman's Medical Dictionary 647, 1161 (26th ed. 1995).

2. To qualify for unemployment compensation benefits, Hanna had to certify that she was "ready, willing, and able to work" and testified that she had been looking for a job. (Tr. 53.). Hanna further claimed that she had applied for office help and clerk positions but opined she

had not been hired for these positions because she had been honest on job applications about her limitations. (Tr. 53.). Hanna failed to elaborate at the hearing about the places of employment to which she submitted applications or the job descriptions therein, nor did she specify how she described her work limitations in these applications.

each other's homes or he would meet Hanna at a local tavern. (Tr. 79.).

### 2. *Hanna's work and medical history*

Hanna was previously employed by Fleetguard, Inc. ("Fleetguard") in Lake Mills, Iowa, as a production assembler from 1984 to February 1993. When she commenced her job with Fleetguard, she testified she was able to perform her physical duties. (Tr. 44.). However, she subsequently developed tendonitis in her wrists, shoulders, neck, and back. After Hanna began treatment for her pain with Dr. John Tagett in 1992, Fleetguard removed her from her duties in production and placed her on light duty in the office, where she performed such tasks as filing, researching, sorting mail, and delivering mail to different people. (Tr. 45–46.). Hanna claimed that she had difficulty performing this "lighter" work as well because she had to take frequent breaks because of pain in her neck caused by looking downward. (Tr. 46, 50.). Hanna testified that she'd "eventually wind up going home early pretty much mostly every day." (Tr. 46.).

In June 1992, Dr. Tagett noted that Hanna had been placed on light duty at Fleetguard, which consisted of clerical work where she was sitting and writing all day long. Specifically, he observed that

the pain in her neck seemed to become worse and she noticed that by writing all day ... her neck was continuously flexed and she was looking down. I think it is quite significant to state that over the weekend the patient almost completely recovers from all her symptoms in her back and neck and when she starts working on Monday she feels pretty good but by Monday evening she is beginning to have pain in her neck and a numb area in her back again and by Tuesday it is quite severe again and remains that way for the rest of the week. The patient has a past history of being treated for depression two years ago. She feels as if she has completely recovered from that and she does not feel depressed and does not have trouble sleeping at night.

At the present time, she has three symptoms: She has pain on the left side of her neck after sitting and writing with her head bent down, however, this goes away when she gets home and gets a good night sleep but this recurs the next day. She also persists in having the numb spot in the left intrascapular area that comes and goes. Her left wrist bothers her some but this is much less. She is currently taking Anaprox DS one twice a day. She was taking Flexeril but this was stopped because it made her sleepy.... She had x-rays of her cervical spine ... and these appear to be normal.

(Tr. 159.). Dr. Tagett diagnosed her as having cumulative trauma disorder of the left neck and upper back and mild tendonitis of the left wrist. (Tr. 159.). As treatment for Hanna, Dr. Tagett took Hanna off work for a short period of time, "hopefully no more than two weeks to get her away from the prolonged and repetitive flexion of her neck and the reaching that she has to do." (Tr. 160.). He also recommended light stretching exercises of her neck and shoulders at home and walking two miles per day, in addition to continued use of Anaprox DS. (Tr. 160.). He opined that "by resting and stretching her muscles that we will then be able to start getting her back to her work." (Tr. 160.).

In July 1992, after Hanna had been absent for work for three weeks and her neck pain had not subsided, Dr. Tagett opined that "this is a case of fibromyalgia." (Tr. 163.). In light of this new opinion, however, Dr. Tagett did not alter his course of treatment significantly except to prescribe Prozac for the agitation she was experiencing. Rather, Dr. Tagett requested that Hanna "continue her exercises and try to do some walking" and suggested she stay home from work. (Tr. 163.). Hanna returned to Dr. Tagett later that same month, reporting that her neck and upper back continued to remain stiff, but the pain in her left wrist was "much better." (Tr. 164.). At this appointment, Dr. Tagett recommended Hanna continue with Prozac and start in "some gentle reconditioning and aerobic exercises...." (Tr. 164.). Dr. Tagett further commented that

[t]his patient has had pain in her neck and her back and wrist now for two years off and on. The pain causes her anger and

frustration I believe and then the anger and frustration cause her neck muscles and her back muscles to tighten up and this reinforces the pain that she is having at work. This seems to be a never ending cycle and will not be resolved until the anger and the frustration have been addressed.

(Tr. 164.). Based upon his opinions regarding the effect of her psychological state upon her physical problems, he referred Hanna to Pamela Little, a social worker, in hopes of "getting this patient back to work happily and productively." (Tr. 164.).

In August 1992, Hanna saw Dr. Tagett again, reporting that she felt a little bit better, and her wrist pain was entirely gone. (Tr. 166.). Because Prozac was causing Hanna difficulties in sleeping, Dr. Tagett switched medications, prescribing Zoloft instead. (Tr. 166.). At this time, Dr. Tagett recommended that Hanna continue with physical therapy and remain home from work. (Tr. 166.). Hanna returned to Dr. Tagett in September 1992, still complaining of back and neck pain. (Tr. 167.). At this appointment, Dr. Tagett made the following recommendations:

> I want the patient to continue on her physical therapy three times a w[eek] and I have refilled her Zoloft ... and I wish for her to continue to see Pam Little in consultation as this seems to be helping the patient. She has been off work since July 13th and I do not think that it is a good idea that she remain inactive so much and I think it is important that she try and get back into the main stream of life. I am going to let her return to work with the restrictions of no lifting, pushing or pulling over 5 lb. and no work above shoulder level. No work requiring prolonged or repeated flexion of the neck and no overtime.

(Tr. 167.). Dr. Tagett elaborated upon the restriction on her neck, recommending that Hanna not work with her neck flexed for over fifteen minutes at one time. (Tr. 169.). After sitting for that period of time with her neck flexed, Hanna should get up, stretch her neck, and walk around for two minutes. (Tr. 170.). Because Dr. Tagett noted that Hanna continued to have this pain in her neck, he scheduled her for an MRI of the cervical spine, which revealed no abnormalities whatsoever. (Tr. 172.).

In October 1992, Dr. Tagett noted that Hanna was improving slowly but progressively. At this time, Hanna reported that she was doing well at work, within the restrictions placed upon her by Dr. Tagett. (Tr. 173.). She was sleeping better and making progress in both her physical therapy [3] and her sessions with Pamela Little. (Tr. 173.). Dr. Tagett continued to place the same restrictions on Hanna's ability to work. (Tr. 173.).

On November 16, 1992, Hanna saw Dr. Rodney Johnson, a physician with the Iowa Institute of Orthopaedics, for an evaluation of neck, infrascapular, and left shoulder pain. (Tr. 175.). Dr. Johnson observed that Hanna's condition was consistent with a fibromyalgia and opined that she had rotator tendonitis and impingement. (Tr. 176.). Dr. Johnson recommended that Hanna use a TENS unit over her trapezium to attempt to control the muscular pain she was experiencing. He also recommended she see Dr. Roy Emerson, an orthopaedic surgeon in Mason City, for a further evaluation of her shoulder. (Tr. 177.). He opined that "there are things that [Hanna] can do in the work place that will control some of the C spine infrascapular pain that she is experiencing, such as raising the [computer] monitor to shoulder level and raising the information packets to eye level

---

**3.** Throughout 1992 and 1993, Hanna saw Donald Barnes, a physical therapist, for treatment for her physical pain. As part of her physical therapy, Barnes recommended Hanna follow a home exercise program, which Barnes revised as needed to improve Hanna's mobility. (Tr. 180–217.). In June 1992, Barnes noted that Hanna's mobility in her cervical and upper thoracic spines was within normal limits. (Tr. 186.). Barnes also recommended a home walking or bicycling pro-

gram, encouraging Hanna on several occasions to increase her activity at home. (Tr. 189, 191, 196, 199A, 200, 203, 205, 216–17.). Specifically, Barnes stated, "The patient is to remain active throughout the day, rather than lying down when she is uncomfortable." (Tr. 199A.). In addition, in November 1992, Barnes observed that "gentle active exercise seem[s] to relieve some of [her] symptoms." (Tr. 214.).

where she doesn't have to flex and rotate the head from side to side repetitively." (Tr. 177.). Lastly, Dr. Johnson commented that he did not believe Hanna would be able to return to a production type activity; rather, she would have to remain on a light duty category at work. (Tr. 177.).

Hanna followed Dr. Johnson's recommendation and saw Dr. Roy Emerson in late 1992 and early 1993. Dr. Emerson opined that Hanna "may have impingement syndrome but there are so many other things going on that it is impossible to sort out to the point where I would recommend any surgical treatment at the present time." (Tr. 179.). Specifically, Dr. Emerson stated that

> [f]rom the standpoint of her shoulder for which I was asked by Dr. Johnson to see her for, I do not think that the job that she has been doing or at least been asked to do, is going to cause any damage to the shoulder. I cannot comment about her neck as I have not evaluated her for that problem.... As near as I can tell, I do not think she is doing any damage to any of the soft tissues [in the shoulder] by the fact that she is having pain.

(Tr. 179.). Dr. Emerson further noted that Hanna was scheduled to see Dr. Bruce Trimble, a rheumatologist, to attempt to rule in or rule out "fibromyositis" and hoped that "more concrete information [would] be available when she [saw] Dr. Trimble." (Tr. 179.).

In January 1993, Hanna saw Dr. Trimble, who opined that Hanna had "fibromyalgia/muscle contraction headache syndrome." (Tr. 223.). After consulting Hanna's obstetrician, Dr. Trimble prescribed amitriptyline to help Hanna with her tension headaches. (Tr. 223.). In addition, Dr. Trimble placed restrictions on Hanna's work at Fleetguard, specifically, (1) that she is to work no more than eight hours per day, forty hours per week; (2) that she is not to lift more than ten pounds; and (3) that she is not to work for more than thirty minutes at a time with her head flexed or extended more than thirty degrees. (Tr. 223.). Lastly, Dr. Trimble

recommended she return for a follow-up in a couple of months. (Tr. 223.).

On February 11, 1993, Fleetguard terminated Hanna's employment, and in a letter addressed to Hanna, dated February 12, 1993, Richard Fries, Employee Relations Manager of Fleetguard, Inc., stated

> It is our understanding, based upon Dr. Trimble's and Dr. Johnson's recommendations, that you are unable to return to your assembly position.
>
> In light of the limitations placed upon you by your physician there are no positions available in the plant that can accommodate your restrictions; therefore, we will have to sever our employment relationship.
>
> Your termination is effective immediately. You will be offered the services of the vocational rehabilitation program and educational reimbursement through Fleetguard, Inc.... Also, we suggest that you contact JTP (Job Training Partnership ...) to discuss other employment and re-training opportunities. Your group insurance will remain in effect through February 28, 1993, at which time you will be eligible for COBRA benefits....

(Tr. 290.). Hanna was still pregnant at the time of her termination. (Tr. 46.).

At Hanna's follow-up visit with Dr. Trimble in March 1993, the doctor noted that "[b]ecause of an apparent threatened abortion, [Hanna's obstetrician] has her on essentially constant bed rest and of course she's not working." (Tr. 223.). Hanna inquired about more physical therapy, but Dr. Trimble opined that "the sort of heat and massage treatment she's been getting are not probably worth the price for this sort of problem." (Tr. 223.). Rather, Dr. Trimble prescribed amitriptyline[4] for her headaches and tylenol for the musculoskeletal discomfort. (Tr. 223.). In addition, he advised her to apply heat to her back as needed. (Tr. 223.). Dr. Trimble is apparently the last physician Hanna saw for her physical problems before the administrative hearing.

---

4. Amitriptyline is an antidepressant agent with mild tranquilizing properties, used in the treatment of mental depression and in the depressive phase of manic-depressive states; sometimes used in the treatment of sleep disorders. Stedman's Medical Dictionary 61 (26th ed. 1995).

In accordance with Dr. Trimble's recommendations, Hanna had been taking amitriptyline; however, at the administrative hearing, Hanna testified that she quit taking this medication two months prior to the hearing because her prescription expired and she can no longer can afford to see a doctor. (Tr. 51.). The only medication she was taking at the time of the hearing was aspirin, three or four times per day, for her back pain. (Tr. 56.). Although Hanna had been seeing a social worker, Pamela Little, who was treating her for depression associated with her problems in the workplace and the loss of a child, Hanna testified at the hearing that she "really [doesn't] feel depressed but [her social worker] seems to think because of dealing with losing [her] job and everything that [she's] got some depression issues." (Tr. 51.). In addition, Little noted in January 1994 that Hanna's depression had diminished since January 1993, (Tr. 282), and Hanna interpreted this decreased depression at the hearing as a result of her attempt to learn to cope with the loss of her job and her child. (Tr. 59.).

### 3. Vocational expert's testimony

Jeff L. Johnson testified as a vocational expert at the administrative hearing. First, the ALJ noted that Johnson had compiled a chart detailing Hanna's past relevant work. The chart indicated Hanna had performed work as a production assembler, an office helper, a bartender, and a cashier. (Tr. 283.). The ALJ proceeded to pose hypotheticals to Johnson. In the first hypothetical, the ALJ asked Johnson to opine whether a claimant could return to her past relevant work if the following set of facts were true:

[The claimant is] an individual who alleges an onset of disability at age 33, currently 34 years of age, high school education and one year of college courses in business. She has a past relevant work history as noted in Exhibit # 29 . . . . she can lift and carry a maximum ten pounds and she could climb down, stoop, kneel, crouch, and crawl on an occasional basis only. In addition she should perform no employment which would require use of her arms overhead level other than an infrequent basis.

(Tr. 83.). Johnson opined that a person fitting that description, with those limitations, could work as an office helper or a cashier II, both of which are jobs at a sedentary exertional level. (Tr. 84.). The ALJ proceeded to add to his hypothetical the following limitations: (1) that the claimant "could perform no employment which would require her left hand to be flexed more than 30 minutes at any one time," and (2) that "she could perform no employment with her neck flexed as [Hanna] indicated in a downward position in over 15 to 30 minutes at a time continuously." (Tr. 84.). In response, Johnson testified that a person with these added limitations could still return to her past relevant work as an office helper or a cashier II. At the hearing, Hanna's attorney inquired how Hanna could perform work as an office helper if she could not bend her neck downward for more than fifteen minutes without feeling pain. Johnson reiterated his belief that she could perform work as an office helper with this limitation because such a job "should not require that an individual have their neck flexed downward for anything greater than 15 minutes per occurrence." (Tr. 85.). However, Johnson opined that an individual who had to lay down three or four times a day for about thirty minutes at unscheduled break periods could not work as either a office helper or a cashier II, as Hanna performed these positions or as they are performed in the national economy. (Tr. 84.). Johnson claimed that such a limitation would "preclude all employment," regardless of what exertional level. (Tr. 84–85.).

### 4. The ALJ's conclusion

In his decision, the ALJ concluded Hanna does not have an impairment or combination of impairments which prevent her from performing her past relevant work as an office helper or a cashier II. (Tr. 27.). Furthermore, the ALJ found that neither Hanna nor her witnesses' testimony regarding her impairments was "fully credible regarding the true extent of [Hanna's] subjective complaints and their actual effect on her work-related capabilities." (Tr. 27.). Thus, the ALJ found Hanna was "not disabled," as defined in the Social Security Act. (Tr. 27.). With this factual background in mind, the

court will now review its jurisdictional basis for hearing this case and then analyze the ALJ's ruling.

### C. The Court's Jurisdictional Basis

In *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the United States Supreme Court described the procedural steps leading up to a district court's review of Social Security appeals as follows:

> The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered *de novo* by the state agency. §§ 404.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 C.F.R. §§ 404.929, 416.1429, 422.201 *et seq.* (1986). Third, the claimant may seek review by the Appeals Council. 20 C.F.R. §§ 404.967 *et seq.*, 416.1467 *et seq.* (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court.

*Yuckert*, 482 U.S. at 142, 107 S.Ct. at 2291.

Section 1383(c)(3) of Title 42 of the United States Code provides that "(t)he final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title...." In pertinent part, 42 U.S.C. § 405(g) states the following:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions....

42 U.S.C. § 405(g) (Supp.1995).

Accordingly, the court has the power to affirm, reverse or remand the ALJ's decision, and "(w)here the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir.1992) (citing *Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir.1989)); *see also Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d Cir.1992) (citing *Thompson*, 957 F.2d at 614; *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980) (reversal proper where remand "would serve no purpose")); *Gavin v. Heckler*, 811 F.2d 1195, 1202 (8th Cir.1987) (reversal proper where "remand would be a futile gesture"). The court, however, cannot grant a remand merely because it is unhappy with the ALJ's result, *Melkonyan v. Sullivan*, 501 U.S. 89, 100–01, 111 S.Ct. 2157, 2164–65, 115 L.Ed.2d 78 (1991), or " 'because substantial evidence' would have supported an opposite decision.' " *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir.1995) (quoting *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir.1993), in turn, quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)). Further, in order to remand a case such as this one, which falls under sentence four of 42 U.S.C. § 405(g),[5] the court must either affirm, modi-

---

5. Sentence four of § 405(g) provides that:

The [district] court shall have power to enter,

fy or reverse the decision so that it will be considered a final judgment. *Melkonyan,* 501 U.S. at 101, 111 S.Ct. at 2164–65; *see also Shalala v. Schaefer,* 509 U.S. 292, 297 & n. 1, 113 S.Ct. 2625, 2629 & n. 1, 125 L.Ed.2d 239 (1993) (holding "a district court remanding a case pursuant to sentence four of § 405(g) must order judgment in the case and may not retain jurisdiction over the administrative proceedings on remand."). With this jurisdictional basis in mind, the court now turns to the standards to be applied upon review.

## II. ANALYSIS

### A. The "Substantial Evidence" Standard

The Eighth Circuit's standard of review in Social Security cases is well-established. This court must affirm the findings of the ALJ if they are supported by substantial evidence in the record as a whole. *Bates v. Chater,* 54 F.3d 529, 531 (8th Cir.1995); *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir.1992) (citing *McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983)); 42 U.S.C. § 405(g). " 'Substantial evidence is less than a preponderance' ..." *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (quoting *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992)), but " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see also Bates v. Chater,* 54 F.3d at 531–32; *Smith,* 31 F.3d at 717 (citing *Ghant v. Bowen,* 930 F.2d 633, 637 (8th Cir.1991)); *Metz v. Shalala,* 49 F.3d 374, 376 (8th Cir.1995). Put another way, "(t)he standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a

zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.' " *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (quoting *Turley v. Sullivan,* 939 F.2d 524, 528 (8th Cir.1991), which, in turn, quoted *Bland v. Bowen,* 861 F.2d 533, 535 (8th Cir.1988)).

When evaluating the evidence in an appeal from the Secretary's denial of benefits, the court must perform a balancing test, evaluating any contradictory evidence. *Neely v. Shalala,* 997 F.2d 437, 439 (8th Cir.1993); *Hight v. Shalala,* 986 F.2d 1242, 1244 (8th Cir.1993); *Sobania v. Secretary of HHS,* 879 F.2d 441, 444 (8th Cir.1989) (citing *Gavin,* 811 F.2d at 1199). "(I)f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [this court] must affirm the [Secretary's] decision." *Orrick,* 966 F.2d at 371; *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). Even if this court "might have weighed the evidence differently, [it] may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome." *Culbertson,* 30 F.3d at 939 (quoting *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). In other words, the court "must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. [The court] may not, however, reverse the Secretary's decision merely because substantial evidence also would have supported an opposite decision." *Frankl,* 47 F.3d at 937 (citing *Smith,* 987 F.2d at 1374 (8th Cir.1993)); *see also Orrick,* 966 F.2d at 371 (in reviewing the Secretary's denial of benefits, the court must do more than "merely parse the record for substantial evidence supporting the decision of the Secretary ..."; the court must consider evidence in the record that detracts from the Secretary's decision as well); *Robinson,* 956 F.2d at 838 (same).

"Review under this standard is not a rubber stamp for the ALJ, however." *Griffon v. Bowen,* 856 F.2d 1150, 1153 (8th Cir.1988)

---

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C.A. § 405(g) (pocket part 1994).

(citing *McMillian,* 697 F.2d at 220). The court must at all times keep in mind that prior to granting or denying benefits, the ALJ has a duty to fully and fairly develop the record. This mandate was recently summarized as follows:

> The Secretary acknowledges that it is her " 'duty to develop the record fully and fairly, even if ... the claimant is represented by counsel.' " *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dep't of Health & Human Serv.,* 13 F.3d 359, 361 (10th Cir.1993) (citing *Dixon v. Heckler,* 811 F.2d 506, 510 (10th Cir.1987)). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based."

*Battles v. Shalala,* 36 F.3d 43, 44–45 (8th Cir.1994) (quoting *Higbee v. Sullivan,* 975 F.2d 558, 562 (9th Cir.1992) (per curiam)). With these standards in mind, the court will now turn to the ALJ's evaluation of Hanna's case.

## B. The Polaski Standard And Subjective Pain Credibility Determinations

 "An ALJ's credibility determinations are, of course, entitled to considerable weight." *Young v. Secretary of Health and Human Servs.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir.1987)); *see also Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988); *Hardaway v. Secretary of Health and Human Servs.,* 823 F.2d 922, 928 (6th Cir.1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit subjec-

tive complaints of pain only if they are inconsistent with the record as a whole. *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322, *supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)); *Bates,* 54 F.3d at 532 (citing *Polaski* ); *Marciniak v. Shalala,* 49 F.3d 1350, 1354 (8th Cir.1995) (citing *Polaski* ); *Chamberlain v. Shalala,* 47 F.3d 1489, 1494 (8th Cir.1995) (citing *Polaski* ); *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski* ) Under *Polaski,*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
>
> 2) the duration, frequency and intensity of the pain;
>
> 3) precipitating and aggravating factors;
>
> 4) dosage, effectiveness and side effects of medication;
>
> 5) functional restrictions.

*Polaski,* 739 F.2d at 1322. In other words, under *Polaski,* an ALJ is free to doubt a claimant's subjective pain complaints. However, he must support a denial of benefits based on a consideration of the above-mentioned five factors. Indeed, the *Polaski* court stated that "(t)he adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (emphasis in original).

As the Tenth Circuit has stated, "(t)o establish disabling pain without the explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony evaluated by the ALJ and weighed alongside the medical evidence."

*Kepler v. Chater,* 68 F.3d 387, 390 (10th Cir.1995) (citing *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988), which, in turn, cited *Luna v. Bowen,* 834 F.2d 161, 165 (10th Cir.1987)); *see also Huston,* 838 F.2d at 1131 (citing *Luna,* 834 F.2d at 165); *Luna,* 834 F.2d at 165; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.1986); *Avery v. Secretary of Health and Human Servs.,* 797 F.2d 19, 21 (1st Cir.1986); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986); *Green v. Schweiker,* 749 F.2d 1066, 1070 (3d Cir.1984).

## C. Relative Burdens Of Proof

A "disability" is defined in 42 U.S.C. § 423(d) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (1994). A disability is found when a claimant is "not only unable to do his previous work but cannot, considering ... his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A) (1994).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl,* 47 F.3d at 937 (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)); *see also Bates,* 54 F.3d at 532; *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir.1995) (citing *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)); 20 C.F.R. § 404.1512(c); *see also Johnston v. Shalala,* 42 F.3d 448, 451 (8th Cir.1994). "If met, the burden of proof then shifts to the Secretary to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience." *Frankl,* 47 F.3d at 937 (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)

(en banc); 20 C.F.R. §§ 404.1520(f), 416.920(f)). *See also Bates,* 54 F.3d at 532; *Johnston,* 42 F.3d at 451 (citing *Turpin v. Bowen,* 813 F.2d 165, 170 (8th Cir.1987)); *Hajek v. Shalala,* 30 F.3d 89, 93 (8th Cir. 1994) (citing *Evans v. Shalala,* 21 F.3d 832, 835 (8th Cir.1994)); *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994); *Smith,* 31 F.3d at 717 (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991)); *Hajek,* 30 F.3d at 93 (citing *Evans,* 21 F.3d at 835); *Walker v. Shalala,* 993 F.2d 630, 632 (8th Cir.1993) (citing *Robinson,* 956 F.2d at 841); *Reed,* 988 F.2d at 814; *Edwards v. Secretary of Health and Human Servs.,* 809 F.2d 506, 507 (8th Cir.1987); *McCoy,* 683 F.2d at 1142.

## D. Review Of The ALJ's Decision

■ Here, Hanna contends the "fighting issue" in this judicial review turns on the vocational expert's testimony, "the only evidence in this case" that Hanna could return to her past relevant work as an office helper or cashier. (Hanna's Brief, p. 6.). Hanna argues that the ALJ improperly found inconsistencies regarding Hanna's need to lie down at least three or four times per day, for thirty to forty-five minutes at a time. Hanna notes that when the vocational expert considered this limitation as part of the ALJ's hypothetical, he concluded that this limitation would preclude all employment. Because Hanna contends such a limitation is documented by her testimony, the testimony of her witnesses, her daily activities, and the medical evidence, she maintains that she cannot return to her past relevant work and is precluded from any and all employment. Hanna claims that the ALJ unfairly discredited Hanna, characterizing her as having the ability to perform light duty office work and quitting employment at Fleetguard, rather than being terminated. The issue for the court is whether the ALJ's decision was supported by substantial evidence in the record as a whole. To make this determination, the court will review the ALJ's order and analyze the record to determine the merit of Hanna's claims.

### 1. Hanna's subjective pain complaints

■ Hanna maintains the ALJ disregarded her subjective complaint that the pain she

experienced required her to lay down at least three or four times per day, for thirty to forty-five minutes at a time, discrediting her testimony unfairly and ignoring evidence of this medical need in the record as a whole. Under *Polaski*, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1) the claimant's daily activities;

2) the duration, frequency and intensity of the pain;

3) precipitating and aggravating factors;

4) dosage, effectiveness and side effects of medication;

5) functional restrictions.

*Polaski*, 739 F.2d at 1322. Furthermore, the ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit the subjective complaints of pain only if they are inconsistent with the record as a whole. *Id.* Here, the ALJ did not find Hanna's allegation that she required these "power naps" throughout the day to be credible in light of the evidence in the record as a whole. The court will examine the record to ascertain whether there is, in fact, substantial evidence to support the ALJ's conclusion regarding this alleged limitation on Hanna's ability to work.

### a. Objective medical evidence

Upon consideration of the medical evidence in the record as a whole, not one doctor required Hanna to take three to four "power naps" or rest breaks for thirty to forty-five minutes at different times each day. Both Dr. Tagett and Dr. Trimble placed limitations on Hanna's ability to work; however, neither doctor referred to necessary periods of rest or recommended that these "power naps" were a required form of treatment for Hanna's symptoms of pain. On the contrary, Hanna's physicians opined that she could perform light work and noted particular limitations, which were included in the ALJ's hypothetical to the vocational expert, based upon examinations of Hanna and review of her medical records. All of Hanna's physicians appeared to focus their treatment of Hanna in the direction of enabling her to perform light work with certain limitations, which did not include the rest breaks alleged by Hanna. For example, when Dr. Tagett temporarily took Hanna off work at Fleetguard, he recommended that Hanna perform light stretching exercises of her neck and shoulders at home and walk two miles per day, in order to "start getting her back to work." (Tr. 160.). Dr. Johnson opined that although Hanna could not return to production work, she could remain in a light duty position at work. (Tr. 177.). In addition, Dr. Emerson opined that her office position at Fleetguard would not damage her shoulder. In fact, Hanna's physical therapist, Donald Barnes, indicated in his notes that "the patient is to remain active throughout the day, *rather than lying down when she is uncomfortable.*" (Tr. 199A.) (emphasis added).

Hanna suggests that Dr. Johnson "had recorded with seeming approval" Hanna's use of laying down for a period of time to control her symptoms. However, Dr. Johnson was just reporting Hanna's subjective account of how she handles her pain; he was not suggesting Hanna's self-imposed "power naps" as a form of treatment. (*See* Tr. 177.). Rather, Dr. Johnson seemed to focus his comments on suggesting modifications in Hanna's workplace, such as adjusting her computer and other items to attempt to lessen the strain on her neck and back. (Tr. 177.). In addition, Hanna contends in her brief that Pamela Little had taught Hanna "power napping" as a way to counteract some fatigue from chronic pain. (Hanna's Brief, p. 10.). However, upon analyzing the record, Little's notes do not reflect that she taught or necessarily recommended "power napping;" she merely stated that Hanna "described having learned to use a number of adaptive skills such as frequent 'power naps' to cope with her physical exhaustion." (Tr. 273.). In fact, by Hanna's own admission, her "power naps" or rest breaks had not been prescribed by any medical source; they are her own prescription for attempting to ease her pain. (Tr. 56.).

Not only did none of her physicians provide that these rest breaks were a required or recommended treatment for her pain, none of Hanna's physicians recommended that she stay home from work permanently or suggested that she is disabled. Her obstetrician did recommend constant bed rest while Hanna was pregnant due to a threatened abortion; this recommendation, however, had nothing whatsoever to do with her complaints of neck or back pain. Because the existence of Hanna's alleged need for frequent rest breaks has no basis in any of the medical evidence or recommendations of Hanna's physicians, the ALJ could have perceived this absence of evidence as inconsistent with Hanna's testimony about her inability to work due to this alleged need.

### b. Observations of third parties and Hanna's daily activities

Also, under *Polaski,* the ALJ should consider the observations of third parties and Hanna's daily activities in weighing the credibility of Hanna's subjective pain complaints. *Polaski,* 739 F.2d at 1322. Hanna argues that the ALJ failed to consider Deborah Christenson and Greg Turvold, both of whom witnessed Hanna laying down and watching television on several occasions as an attempt to alleviate her pain. An ALJ has a statutory duty to assess the credibility of each witness who testifies at the administrative hearing. *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir.1995); *Nelson v. Sullivan,* 966 F.2d 363, 366 (8th Cir.1992); *Tucker v. Heckler,* 776 F.2d 793, 796 (8th Cir.1985). Here, the ALJ discredited both of these witnesses' testimony because he believed that they were only reporting what Hanna had expressed as her choice of treatment for her symptoms of pain. The ALJ could have found this testimony carries little weight, considering that the testimony of both witnesses was based on Hanna's own subjective expressions of discomfort. In addition, the ALJ could have concluded that the witnesses' testimony was not credible in light of their testimony, along with that of Hanna, regarding Hanna's daily activities. Both Christenson and Turvold testified that Hanna is able to run errands, and Turvold testified that he and Hanna visit each other's homes, wherein Hanna cooks

dinner for him on occasion, and they also meet uptown at a local tavern from time to time. Although both witnesses noted Hanna's apparent fatigue from lifting her son, neither witness disputed the fact that she manages to care for her son on her own. Furthermore, Hanna testified at the administrative hearing that she manages to cook and clean "in spurts," as well as care for her son and a small dog. She does her own laundry and grocery shopping, as well as running errands and driving from place to place. In light of the basis for the witnesses' observations and Hanna's daily activities, the court finds the ALJ properly gave full consideration to the observations of third parties and Hanna's daily activities in discounting her alleged need for multiple rest breaks throughout the day.

### c. Treatment for Hanna's impairments

Among other factors the ALJ considered in discounting Hanna's subjective pain complaints, including her need for rest breaks throughout the day, was the treatment of her impairments. While Hanna did seek treatment for her pain through physical therapy and medication, Hanna has not seen a physician for treatment since March 1993. In accordance with Dr. Trimble's recommendations, Hanna had been taking amitriptyline; however, at the administrative hearing, Hanna testified that she quit taking this medication two months prior to the hearing because her prescription expired and she can no longer can afford to see a doctor. (Tr. 51.). The only medication she was taking at the time of the hearing was aspirin, three or four times per day, for her back pain. (Tr. 56.). Hanna testified that she has to lay down as a method of treatment because she cannot afford any alternative method of treatment, such as seeing a physician, undergoing physical therapy, or taking prescribed medication. While it is evident from the record that Hanna's only income at the time of the administrative hearing was derived from unemployment compensation benefits, on this minimal income, she managed to afford to hire others to help her with cleaning and yard work. (Tr. 50.). It is a decision for the ALJ, in the first instance, to determine a

plaintiff's motivation for failing to follow a prescribed treatment plan. *See Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir.1989) (citing *Benskin v. Bowen*, 830 F.2d 878, 884 n. 1 (8th Cir.1987)). Based on the evidence regarding the income she did have and her ability to hire others to assist her, the ALJ could have concluded her financial concerns were not severe enough to justify her failure to seek further treatment.

In addition, several physicians and her physical therapist had prescribed treatment for Hanna that seemingly required no expense whatsoever, including a home exercise program, including stretching, walking, bicycling, (Tr. 160, 163, 164, 189, 191, 196, 199A, 200, 203, 205, 216–17). Her physical therapist specifically told Hanna she should not lay down when she is uncomfortable, but rather attempt to remain active. (Tr. 199A.). There is no evidence in the record indicating that Hanna has attempted any exercise at home subsequent to her last visit with a physician; rather, both she and her witnesses testified that she lays down whenever she can to attempt to alleviate her pain. Failure to follow a prescribed treatment plan without good reason can be grounds for denying a plaintiff's application for benefits. *See Johnson*, 866 F.2d at 275; *see also Roth*

*v. Shalala*, 45 F.3d 279, 282–83 (8th Cir.1995) (where plaintiff failed to follow recommended exercise regimen, much of pain plaintiff experienced was due to inactivity; court recognized this failure to perform a prescribed course of remedial treatment as a factor in discrediting plaintiff's subjective pain complaints) (citing *Johnson*, 866 F.2d at 275). The record reflects that Hanna followed her own treatment plan, rather than the treatment prescribed by her physicians and her physical therapist. In light of this evidence, the court finds that the ALJ gave full consideration to her attempts or lack thereof to follow treatment plans for her condition in discrediting Hanna's allegation that she needs thirty to forty-five minute rest breaks, several times throughout the day and in determining that Hanna is not disabled under the Social Security Act.[6]

#### d. Summary of evidence regarding subjective pain complaints

In summary, the ALJ did more than make a cursory reference to *Polaski* when examining the evidence relating to Hanna's allegation that her ability to work is limited by her need for rest breaks. In fact, there is ample objective medical evidence, along with other evidence regarding the observations of Han-

---

**6.** Another factor to consider under *Polaski* in discounting subjective pain complaints is a claimant's prior work record. *Polaski*, 739 F.2d at 1322. Hanna claims that there is evidence in the record that she is unable to perform light duty work in general in that Fleetguard terminated her because of their inability to accommodate her limitations. However, in reference to her job at Fleetguard, Hanna testified at the administrative hearing that because of the pain in her neck from looking downward, she'd "eventually wind up going home early pretty much mostly every day." (Tr. 46.). In addition, in a letter to Hanna from Richard Fries, the Employee Relations Manager at Fleetguard, Fries opens his letter by saying "[i]t is our understanding, based upon Dr. Trimble's and Dr. Johnson's recommendations, that you are unable to return to your assembly position." (Tr. 290.). It is not altogether clear whether Hanna was terminated because she could not return to her position as a production assembler or her later position performing office work. Furthermore, it is likewise unclear from the record whether Hanna was performing the office work according to the limitations prescribed by her doctors or whether her absenteeism or need for thirty to forty-five minute rest breaks played a role in Fleetguard's termination

decision. Lastly, Hanna was pregnant and, according to her obstetrician's orders, required absence from work and constant bed rest for the latter part of her pregnancy due to a threatened abortion. Regardless of any of these circumstances regarding her job status at Fleetguard, the inquiry is whether Hanna has the *ability* to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. *See McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982). Although the ALJ apparently mischaracterized her termination as a voluntary quit in his decision, his characterization is not dispositive to the issue before the court, which is whether there is substantial evidence in the record as a whole of Hanna's disability under the Social Security Act. Based upon the medical evidence, Hanna's daily activities, and the treatment of her pain, the court finds that, irrespective of her prior work record at Fleetguard and the ALJ's mischaracterization of her termination, the ALJ gave full consideration to Hanna's subjective pain complaints under *Polaski*, and that there is substantial evidence in the record as a whole to support the ALJ's decision that Hanna is not disabled under the Social Security Act.

na's witnesses, Deborah Christensen and Greg Turvold, her daily activities, and her compliance with prescribed plans of treatment, to support the ALJ's finding that Hanna's allegation that she required several rest breaks throughout the day was not credible. Hanna claims that the fighting issue is the vocational expert's testimony regarding Hanna's ability to perform her past relevant work, specifically, the inclusion of Hanna's need for "power naps" or rest breaks into the ALJ's hypothetical and the vocational expert's conclusion that all employment would be precluded if this allegation was considered credible. The court now turns to an examination of the hypothetical given at the administrative hearing and the law pertaining to hypotheticals as substantial evidence of disability under the Social Security Act to determine whether the ALJ appropriately discredited Hanna's allegation and concluded that she was capable of returning to her past relevant work.

### 2. The ALJ's hypothetical

At the administrative hearing, the vocational expert testified that based upon the ALJ's initial hypothetical, which incorporated the lifting restriction in Dr. Trimble's notes, (Tr. 223), along with the restrictions on flexion of the neck in a downward position indicated by Dr. Tagett, adopted by Dr. Emerson, and reiterated by Dr. Trimble, (Tr. 169, 179, 223), Hanna could return to her past relevant work as an office helper or a cashier II. In response to an alteration of the ALJ's hypothetical, however, the vocational expert testified if the individual in the ALJ's hypothetical had to lay down three or four times a day for about thirty minutes at unscheduled break periods, that individual would not be capable of performing his past relevant work or any other work that existed in significant numbers in the national economy. (Tr. 113–16.).

■ An ALJ's hypothetical question must fully describe a claimant's impairments. *Chamberlain,* 47 F.3d at 1495 (citing *Shell-track v. Sullivan,* 938 F.2d 894, 898 (8th Cir.1991)). If vocational expert testimony is based upon an insufficient hypothetical question, it "does not constitute substantial evi-

dence to support a finding of no disability." *Id.; Ekeland v. Bowen,* 899 F.2d 719, 722 (8th Cir.1990) (hypothetical cannot constitute substantial evidence if it does not include all of the claimant's impairments); *McMillian v. Schweiker,* 697 F.2d 215, 222 (8th Cir.1983) (hypothetical is not substantial evidence where it failed to precisely set out claimant's impairments of fatigue and difficulty in concentration). However, "[w]hile it is clear that 'questions posed to vocational experts ... should precisely set out the claimant's particular physical and mental impairments,' " *Greene v. Sullivan,* 923 F.2d 99, 101 (8th Cir.1991), a proper hypothetical question is "sufficient if it sets forth the impairments which are accepted as true by the ALJ." *House v. Shalala,* 34 F.3d 691, 694 (8th Cir. 1994) (citing *Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985)); *see also Cruze v. Chater,* 85 F.3d 1320, 1322–23 (8th Cir.1996) (ALJ's hypothetical need only include those impairments he finds substantially support by the record as a whole). Therefore, the court's analysis of the sufficiency of the ALJ's hypothetical question involves a determination of whether the impairments accepted by the ALJ were appropriate in light of the record as a whole.

The ALJ discredited Hanna's allegation that these rest breaks were an additional limitation on her ability to work. As indicated in Section II(D)(1)(d) of this opinion, the court finds there is ample evidence to indicate that the substantial evidence in the record as a whole supports the ALJ's conclusion that Hanna's alleged need for rest breaks throughout the day were inconsistent with the medical evidence, including the diagnoses and recommendations of her physicians and her physical therapists. Both Dr. Tagett and Donald Barnes, her physical therapist, encouraged her to avoid "remaining inactive" and recommended she "get back into the main stream of life." (Tr. 167, 199A.). In light of Hanna's daily activities, the observations of her witnesses, her failure to follow the prescribed treatment plans of her physicians, which included suggested treatment that she could follow without expense, the court finds the ALJ correctly discredited Hanna's allegation that her need for "power naps" or rest breaks is a limitation on her

ability to work. Because the ALJ correctly discounted this allegation and the restrictions in the ALJ's hypothetical were based upon the evidence in the record as a whole, the court finds the vocational expert's testimony based upon the ALJ's hypothetical excluding the necessity for rest breaks or "power naps" is substantial evidence in the record as a whole indicating Hanna's ability to return to her past relevant work as an office helper or a cashier II. *See Cruze,* 85 F.3d at 1322–23 (vocational expert's testimony based upon a properly phrased hypothetical question constitutes substantial evidence of disability). Thus, the court concludes the ALJ's finding that Hanna could return to her past relevant work and thus is not disabled under the Social Security Act is supported by substantial evidence in the record as a whole.

### III. CONCLUSION

Based on its review of the record and the ALJ's decision, the court is persuaded the ALJ properly applied the standards outlined in *Polaski* in discrediting Hanna's allegation that her alleged need for several thirty to forty-five minute rest breaks throughout the day was a limitation on her ability to work. The court concludes the ALJ's credibility determination regarding Hanna's alleged need for "power naps" or rest breaks is supported by substantial evidence as a whole. The ALJ properly recognized the inconsistencies in the record between Hanna's actual impairments and limitations and the objective medical evidence, her daily activities, the observations of her witnesses, her attitude toward and compliance with prescribed treatment, and her subjective pain complaints and discredited Hanna's claim that "power naps" precluded her from employment. The court concludes the ALJ's hypotheticals properly described the impairments the ALJ accepted as true based on the evidence in the record as a whole. Therefore, based on a review of the ALJ's decision and the record as a whole, the court concludes there is substantial evidence in the record indicating that Hanna could work as an office helper or a cashier II, both of which are employment positions that exist in significant numbers in the national economy. For these reasons, the court concludes there is substantial evidence in the

record as a whole to support the ALJ's finding that Hanna is not disabled and not entitled to disability insurance benefits. Therefore, judgment shall be entered affirming the ALJ's decision.

**IT IS SO ORDERED.**