# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Andrea Silva**

    v.

**US Social Security Administration,**
**Acting Commissioner**

Case No. 17-cv-368-PB
Opinion No. 2018 DNH 156


## MEMORANDUM AND ORDER

Andrea Silva challenges the denial of her claim for Social Security disability insurance ("SSDI") benefits under Title II of the Social Security Act, 42 U.S.C. § 405(g). Silva argues that the Administrative Law Judge ("ALJ") erred by failing to adequately develop the record in considering her physical impairments, and by inadequately explaining the finding that she "sought minimal treatment" during the period in question. She also argues that the ALJ's determination that her polysubstance abuse was a "contributing material factor" to her disability was unsupported by substantial evidence. The Acting Commissioner moves for an order affirming the decision. For the following reasons, I deny Silva's motion and affirm the Commissioner's decision.

## I.   BACKGROUND[1]

Silva is a 50 year-old woman with a high school education.
Doc. No. 11 at 2; Administrative Transcript ("Tr.") 134.  She
has previously worked as a licensed nurse's assistant ("LNA")
from 2000 to 2014.  Doc. No. 11 at 2; see Tr. 160.  In or around
January 2014, Silva was fired from her job at Speare Memorial
Hospital in Plymouth, NH for violating the hospital's drug and
alcohol policy.  Doc. No. 11 at 2.  She had violated the drug
and alcohol policy by overdosing on multiple substances while at
work.  See Tr. 159, 321.  As a result of the incident, her
nursing license was revoked.  Tr. 159, 302.  Although Silva has
reported struggles with anxiety and substance abuse stretching
as far back as 2004, those afflictions worsened in March 2013
when her husband of 22 years left her.  Tr. 302, 321.  She
alleges a disability onset date of January 21, 2014, claiming
that her anxiety and panic disorder have prevented her from
working since that time.  Doc. No. 11 at 1.

Silva's application for benefits was initially denied.  Tr.
96.  Her claim progressed to a hearing before ALJ Elizabeth M.
Tafe on March 30, 2016.  Tr. 18, 27.  Both Silva, unrepresented

---

[1] In accordance with Local Rule 9.1, the parties have submitted a
joint statement of stipulated facts.  Doc. No. 11.  Because that
joint statement is a part of the court's record, I only briefly
discuss the facts here.  I discuss further facts relevant to the
disposition of this matter as necessary below.

2

by counsel, and a vocational expert testified at the hearing. Tr. 34, 42, 58.  During the hearing, Silva notified the ALJ of some recent back pain that limited her ability to lift things, and presented a record of a recent medical appointment evaluating that pain.  Tr. 37, 54-56.  This was the first time she alleged a physical impairment of any kind.  Tr. 54; see Tr. 159-62 (SSDI application claiming her medical conditions were only anxiety, panic disorder, and depression).  She also notified the ALJ that several follow-up appointments to further address this pain had been scheduled for the upcoming weeks. Tr. 37.  At the end of the hearing, the ALJ decided to hold the record open for two weeks for Silva to submit any additional evidence from those upcoming appointments.  Tr. 63.  The post-hearing evidence obtained by the ALJ was then incorporated into the administrative record and reviewed by the ALJ.  Tr. 222-223 (referencing Tr. 342-349).  On August 31, 2016, the ALJ denied Silva's claim by written decision.  Tr. 27.  On July 11, 2017, the Social Security Administration ("SSA") Appeals Council denied Silva's request for review, rendering the ALJ's decision the final decision of the Acting Commissioner.  Doc. No. 11 at 2; Tr. 1.  Silva now appeals.  Doc. No. 10.

## II.   THE ALJ'S Decision

3

On August 31, 2016, the ALJ determined that Silva was "not disabled" under the Social Security Act because she would not be disabled if she stopped her substance use.  Tr. 26-27.  In her written decision, the ALJ first assessed Silva's claim in light of all her impairments, including her diagnosed polysubstance abuse, and concluded that Silva was disabled.  Tr. 19-25. Pursuant to applicable regulations, the ALJ continued her analysis to determine whether Silva's polysubstance abuse was a "contributing factor material to the determination of disability."  Tr. 25-26; see 20 C.F.R. § 404.1535; SSR 13-2P, 2013 WL 621536, at *4-5 (S.S.A. Feb. 20, 2013).  After finding that it was, the ALJ concluded that Silva had not been disabled "at any time from the alleged onset date through the date of [her] decision."  Tr. 26-27.

At step one of her initial analysis, the ALJ determined that Silva had not engaged in substantial gainful activity since January 21, 2014.  Tr. 21.  At step two, she determined that Silva suffered from "the following severe impairments: generalized anxiety disorder, depressive disorder-NOS [not otherwise specified] and polysubstance abuse disorder."  Tr. 21. She also found that Silva's back pain constituted a non-severe impairment.  Tr. 22.  In making the latter determination, the ALJ noted a lack of evidence of treatment related to Silva's complaints of back pain.  Id.  She further emphasized that

4

Silva's back strain was a non-severe impairment because there was no evidence of any "medically determinable musculoskeletal impairment [affecting] her ability to perform basic work functions for any period of 12 months." Tr. 22. At step three, the ALJ found that none of Silva's impairments, considered individually or in combination, qualified for any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which would have rendered her disabled per se. Id.; see 20 C.F.R. § 404.1520(d), 404.1525, and 404.1526.

At step four, the ALJ determined that Silva had the residual functional capacity ("RFC") "to understand, recall and carry out short, simple instructions," but that she could not "sustain concentration and attention for even routine, familiar tasks for 2-hours at a time throughout an 8-hour workday." Tr. 23. She further determined that Silva could not "maintain a regular work schedule," that "she [would] be off task [for] at least 15% of the workday," and that she would "be out of work at least two days per month on a consistent basis." Id. She finally found that Silva could have "occasional brief interactions with the public," and was capable of "accommodat[ing] to routine, familiar, changes." Id. In light of this RFC, the ALJ determined that Silva could not return to her past work as an LNA. Tr. 24.

In making her RFC determination, the ALJ considered Silva's entire medical record and several expert opinions, including those pertaining to the effects and diagnoses of her polysubstance abuse. Tr. 23-24. In so doing, the ALJ gave great weight to the June 2014 opinion of Dr. Laura Landerman, a State Agency reviewing psychologist. Tr. 23, 72-76. At the time of her review, Dr. Landerman believed that Silva's substance abuse was still an active issue despite Silva's claims of sobriety since the overdose in January 2014. Tr. 75. Accordingly, she opined that it could "not be factored out" in assessing Silva's mental RFC. Tr. 75. Importantly, she opined that all of Silva's impairments rendered her "unable to maintain a regular full time work schedule and attendance." Tr. 74. She also opined that Silva was "unable to adequately and consistently sustain" concentration, persistence, and pace for extended periods "without interruptions from [her] psych symptoms, namely anxiety and [drug addiction or alcoholism]." Tr. 88.

At step five, after considering the hearing testimony of a Vocational Expert ("VE"), the ALJ determined that there were no jobs that existed in significant numbers in the national economy that Silva could perform when her polysubstance abuse was an active issue. Tr. 24-25. In rendering her opinion, the VE was asked to consider whether jobs existed for a hypothetical person

6

of Silva's age, education, work experience, and the aforementioned RFC. Tr. 59-61. Specifically, the VE was asked to consider the significance of the RFC components limiting such a person to "be[ing] off task at least 15 percent of the workday," and being absent from work more than one day per month. Tr. 61. She opined that such limitations would be "beyond customary tolerances" and would completely preclude such a person from "competitive work." Tr. 61. Therefore, the ALJ concluded that she would be disabled when "considering all of [Silva's] impairments, including [her] substance use disorders," she was disabled. Tr. 24.

Due to the evidence of substance abuse, however, the ALJ proceeded with her analysis to determine whether substance abuse was a "contributing factor material to the determination of disability." 20 C.F.R. § 404.1535. Social Security Ruling 13-2p prescribes the manner in which an ALJ must proceed in cases involving objective medical evidence of drug addiction and alcoholism ("DAA"). SSR 13-2P, 2013 WL 621536, at *6; see 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."); 20 C.F.R. § 404.1535. According to SSR 13-2p, once the ALJ finds a claimant disabled, he or she must go on to determine "whether the

7

claimant would continue to be disabled if he or she stopped using drugs or alcohol," i.e. "whether DAA is 'material' to the finding that the claimant is disabled." See SSR 13-2P, 2013 WL 621536, at *2. Accordingly, the DAA evaluation process essentially requires the ALJ to apply the sequential analysis a second time while disregarding the effects of the claimant's substance abuse. See 20 C.F.R. § 404.1535; SSR 13-2P, 2013 WL 621536, at *4-6, 14; see also, e.g., Sax v. Colvin, 31 F. Supp. 3d 1156, 1161 (E.D. Wash. 2014) ("[T]he ALJ conducts the sequential evaluation a second time and considers whether the claimant would still be disabled absent the substance abuse.").

Thus, in Silva's case, the ALJ performed a so-called DAA evaluation to determine whether Silva's polysubstance abuse was "a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535; SSR 13-2P, 2013 WL 621536, at *6. At step two of her reanalysis, the ALJ determined that "even when [Silva's] substance abuse is not a factor," she has "continued to have problems with anxiety and depression." Tr. 25. Therefore, the ALJ found that Silva would continue to have severe impairments even in the absence of substance use. Id. The ALJ then determined that without the substance use, Silva would still not have an impairment that meets any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 25. Next, at step four, the ALJ determined that, without substance use, Silva

8

would have the RFC "to perform work at all exertional levels," that she "would be able to understand, recall, and carry out short, simple instructions," and that she *could* "sustain concentration and attention for 2-hours at a time for routine, familiar tasks." Tr. 25. She also found that Silva could "persist[] at routine, familiar tasks at a variable, but acceptable pace," and that "[s]he could have occasional, brief interactions with the public," and "could accommodate to routine, familiar changes." Tr. 25. The ALJ nevertheless determined that even if Silva stopped her polysubstance abuse, she would not be able to return to her past work as an LNA. Tr. 26.

In making this non-DAA RFC determination, the ALJ again relied on an opinion of Dr. Landerman, but from a second, more recent evaluation in November 2014. Tr. 25, Tr. 89-92. By the time of her second review, Dr. Landerman opined that Silva's polysubstance abuse was in early remission, but her anxiety was still active. Tr. 91. Her updated mental RFC was similar to the one previously discussed, except that it differed in two material respects. First, in November 2014, Dr. Landerman opined that Silva "was not significantly limited" in her abilities "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." Tr. 90. Second, she opined that Silva was "able

9

to sustain concentration and attention for two hours for routine familiar tasks." Tr. 90. The ALJ read Dr. Landerman's opinion to indicate that "in the absence of substance abuse, [Silva] would have no more than moderately impaired functioning in any domain." Tr. 25. The ALJ also found her non-DAA RFC to be consistent with the opinion of Dr. Rexford Burnette, a state consultative psychologist, who examined Silva in October 2014, Tr. 320-325, as well as a report submitted from Speare Memorial Hospital, Silva's longtime employer up until her alleged onset date, Tr. 191-192. Tr. 25-26. The report from Speare Memorial Hospital stated that, up until the time she lost her license in January 2014, Silva had been able to perform her work "properly and satisfactorily," providing direct and indirect patient care. Tr. 25, 191.

Finally, at step five, after considering testimony from the VE, the ALJ found that there would be a significant number of jobs in the national economy that Silva could perform if she stopped substance use. Tr 25. Specifically, the ALJ accepted the VE's opinion that a hypothetical person of Silva's age, education, work experience, and non-DAA RFC could perform the representative jobs of "housekeeper," "merchandise marker," and "kitchen helper." Tr. 26. Accordingly, the ALJ found that Silva's polysubstance use disorder was a "contributing factor material to the determination of disability," and she was

10

therefore "not disabled" within the meaning of the Social Security Act.  Tr. 26; see 42 U.S.C. § 423(d)(2)(c); 20 C.F.R. § 404.1535.

Silva asked the SSA Appeals Council to review the ALJ's decision.  See Tr. 13.  In a letter dated July 11, 2017, to Silva, SSA explained that it found no reason under its rules to review the ALJ's decision and therefore denied Silva's request for review, leaving the ALJ's decision as the final decision.  Tr. 1.[2]

## III. <u>STANDARD OF REVIEW</u>

I am authorized under 42 U.S.C. § 405(g) to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  That review is limited, however, "to determining whether the [ALJ] used the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  I defer to the ALJ's findings of fact, as long as

---

[2] The letter stated that under SSA rules, it will review an ALJ's decision for any of the following reasons: abuse of discretion by the ALJ, an error of law, lack of substantial evidence, broad policy or procedural issues affecting the public interest, or if it receives additional, new, material evidence that could reasonably change the outcome of the ALJ's decision. It determined that none applied in this case, and affirmed the ALJ's decision.  Tr. 1-2.

11

those findings are supported by substantial evidence.  Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the ALJ's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion."  Id. at 770.  If, however, the ALJ "ignor[ed] evidence, misappl[ied] the law, or judg[ed] matters entrusted to experts," her findings are not conclusive.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  The ALJ is responsible for determining issues of credibility, drawing inferences from evidence in the record, and resolving conflicts in the evidence.  See Irlanda Ortiz, 955 F.2d at 769.

## IV.  ANALYSIS

Silva alleges three errors that she argues warrant reversal.  Doc. No. 10-1.  First, she contends that the ALJ failed to adequately consider the combined impact of all of her medically determinable impairments and neglected to sufficiently develop the record with regard to her reported back pain.  Id.

12

at 3.  Second, she argues that the ALJ incorrectly evaluated her personal testimony regarding the extent of her functional limitations and polysubstance abuse.  Id. at 6.  Third, she argues that the ALJ's DAA evaluation was not based on substantial evidence.  I address and reject each of Silva's arguments in turn.

## A.   Failure to Adequately Develop the Record

Silva first argues that the ALJ failed to adequately develop the record with regard to her lower back pain.  Doc. No. 10-1 at 3-4.  She contends that the ALJ failed to obtain available and more complete reports of her back injury, which could have been used to determining whether her back injury was a severe impairment and whether it limited her ability to work. Id. at 5.  I reject this argument because the ALJ held the record open after the hearing and requested additional records, and because Silva has failed to indicate what, if any, records would have influenced the outcome of the ALJ's decision.

"Because Social Security proceedings are not adversarial in nature, the [ALJ has] a duty to develop an adequate record from which a reasonable conclusion can be drawn."  Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (internal citations and quotations omitted).  "This duty to develop the record is heightened where the claimant is not represented by counsel, but applies in all cases."  Brunel v. Barnhardt, No. 00-cv-402, 2002

13

WL 24311, *8 (D.N.H. Jan. 7, 2002) (citing 20 C.F.R. § 404.1512(d)). "[F]or an ALJ's failure to develop the record to constitute reversible error, the claimant must demonstrate that he or she has suffered some prejudice as a result." Russell v. Colvin, No. 13-cv-398, 2014 WL 4851327, *4 (D.N.H. Sept. 29, 2014) (citing Gaudreault v. Astrue, 2012 D.N.H. 108, 14-15)). "Prejudice is demonstrated by showing that the additional evidence might have led to a different decision." Alker v. Astrue, 2011 D.N.H. 075, *4 (internal citations and quotations omitted).

Here, the ALJ satisfied her obligation to develop the record by keeping the record open after the March 2016 hearing took place, and requesting and obtaining additional medical evidence from that time. During the March 30, 2016 hearing, Silva testified that she had had recent back pain that caused her foot to drag, although no such impairment had been cited in her original application. Tr. 54. She also indicated that she had several appointments scheduled in the two weeks following the hearing. Tr. 62-63. Accordingly, the ALJ told Silva that she would leave the record open for two weeks to allow Silva to submit any additional evidence of her back pain generated during those appointments. Tr. 63. On August 11, 2016, the ALJ notified Silva of the records she had received during the post-

14

hearing period and provided Silva with specific options as to how to proceed. See Tr. 222.

The new records included treatment notes from Nurse Practitioner Kelly Watkins from March 21, 2016 and April 4, 2016, who treated Silva for a lower back strain.[3] See Tr. 349, 344. The ALJ invited Silva to submit written comments about the new evidence, any additional records that she wished to be considered, and any questions that Silva might have for the authors of the records. Tr. 222. The ALJ also wrote that she would grant a supplemental hearing to discuss the records if requested by Silva. Id. At such hearing, the ALJ stated, Silva would have an opportunity to produce witnesses, testify, and submit additional evidence. Id. The notice further emphasized that if the ALJ did not receive a response from Silva within ten days, she would assume that Silva did not want to submit any additional evidence or hold a supplementary hearing and would at that time accept the new evidence into the record and issue her decision accordingly.[4]  Tr. 223.

---

[3] Silva also indicated her expectation that additional records would be generated from an appointment with a clinical social worker, Joe McKeller, relating to her depression and anxiety. See Tr. 63. The ALJ obtained at least some of those records, but they do not reflect any material change. Tr. 342, 343, 348.
[4] The record does not contain a response from Silva, nor does Silva contend that she responded.

15

Consistent with that notice, the ALJ considered the records received, and discussed them in her August 31 decision. Tr. 22. She found that although NP Watkins had diagnosed Silva with a lumbar strain, and prescribed her physical therapy, see 344, there was no evidence that Silva had had a medically determinable musculoskeletal impairment affecting her "ability to perform basic work functions for any period of 12 months," as required to be considered as an impairment under applicable regulations. Tr. 22; see 20 C.F.R. §§ 404.1509, 404.1521, 404.1523. Although NP Watkins had also ordered Silva to undergo a lumbar spine x-ray, see Tr. 344, a hypothetical record that Silva now faults the ALJ for failing to obtain, see Doc. No. 10-1 at 6, Silva does not allege that she even underwent such an x-ray, let alone when. Nor does she provide any indication as to what that x-ray would show if it exists.

The ALJ's post-hearing efforts in obtaining and considering these records are appropriate and sufficient to fulfill her aforementioned duty. Cf. Gaudreault, 2012 D.N.H. 108, *6 (the ALJ should have kept the record open post-hearing to fix "glaring gaps" in the medical records because it "would have entailed little or no extra effort on the ALJ's part, and would not have delayed" her decision). The ALJ notified Silva of her opportunity to review the received records, submit comment,

16

supplement the records, and request a further hearing.  Her duty to develop the record required nothing more.

Nevertheless, even if the ALJ had not sufficiently fulfilled her obligation to develop the record, Silva has failed to demonstrate that any additional records would have changed the outcome of the ALJ's decision in her favor.  See Blanchette v. Astrue, No. 08-cv-349, 2009 WL 1652276, *13 (D. N.H. June 9, 2009) (finding that the claimant could not show harmful error when the "claimant does not say what more the ALJ would have learned from the questioning she says should have been conducted").  All Silva presents to establish that she was prejudiced by the ALJ's post-hearing development is her speculation that had the ALJ obtained records of a lumbar spine x-ray or records from similarly ordered physical therapy, the ALJ would have determined her back impairment to be severe. Silva alleges that these records might have been generated sometime between the March 2016 hearing and the August 2016 decision based on the mere fact that NP Watkins ordered them. See Doc. No. 10-1 at 6.  But Silva fails to present any evidence that she followed through on those orders and that the records of the x-ray or physical therapy actually exist, let alone that they would have led to a different decision.  This conjecture falls well short of establishing reversible error.  See Doc. No. 10-1 at 6; Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997)

17

("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant remand.") (internal quotation and citation omitted).

In sum, Silva was given ample opportunity to supplement the post-hearing records, but failed to do so. Because Silva has not demonstrated that the ALJ's failure to obtain her X-ray and physical therapy records prejudiced her claim, such a failure was harmless and does not warrant remand.

## B.   **Failure to Seek or Comply with Treatment**

Silva next appears to argue that the ALJ erred in finding that her failure to regularly seek treatment for her impairments undermined her own subjective allegations of pain and its limiting effects. Specifically, Silva cites the ALJ's finding that her "allegations [were] generally consistent with the medical evidence to the extent that she has had some problems with anxiety and mood," but also noted that Silva had "sought minimal treatment" over the two-and-half-year period in question. Tr. 23.[5] The ALJ went on to cite several examples, such as evidence that Silva did not "follow-through" with certain counseling in April 2014, and that "she did not seek any

_____

[5] Although this observation was made in the context of developing the initial, all-inclusive RFC, which supported a finding of disability, it arguably implicates the second, non-DAA RFC with equal force.

18

mental health treatment again until approximately March 2016."
Tr. 23.

Citing Social Security Ruling 16-3P, Silva now argues that the ALJ erred in failing to consider possible reasons that might explain why she had infrequently sought and complied with treatment. Doc. No. 10-1 at 7-9. Specifically, she cites three "reasons" that the ALJ should have considered: (1) she lacked medical insurance coverage and was unable to pay for treatment, (2) she believed the side effects of the medication were worse than the original symptoms, and (3) her mental impairments prevented her from understanding her need for treatment. Doc. No. 10-1 at 8-9. None of these arguments are ultimately persuasive.

The ALJ may consider an individual's treatment history, "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities". SSR 16-3p, 2016 WL 1119029, *8. SSR 16-3p provides that an ALJ may find a claimant's subjective complaints "inconsistent with the overall evidence of record" if "the frequency or extent of the treatment sought . . . is not comparable with the degree of the individual's subjective complaints," or if the if the individual fails to follow prescribed treatment. Id. Such a determination, however, cannot be made "without considering possible reasons [why] he or she may not comply with . . . or

19

seek treatment.  Id.  Possible reasons that a claimant may not seek or comply with treatment include, *inter alia*,(i) "side effects [of medication that] are less tolerable than the symptoms," (ii) an inability to afford treatment or lack of access to low-cost care, or (iii) an inability to appreciate the need for treatment because of a mental impairment.  Id. at *9.

It is worth emphasizing at the outset that the ALJ did not find Silva's subjective complaints to be "inconsistent" with the objective medical evidence.  Instead, she found them to be "generally consistent."  Tr. 23.  Thus, arguably, there is no departure from SSR 16-3P to even address, as the ruling plainly conditions the requirement that an ALJ consider these "reasons" on a finding that a claimant's failure to seek treatment renders his or her subjective complaints *inconsistent* with the medical record.  SSR 16-3p, 2016 WL 1119029, *8.

Nevertheless, Silva is not entitled to a remand even if I assume for purposes of analysis that the ALJ's finding that Silva's subjective complaints were "generally consistent" with the medical record, juxtaposed with her comments regarding the "minimal treatment" sought, implies some degree of inconsistency.  Although the ALJ did not explicitly identify any reasons Silva might have had for failing to more regularly seek treatment, any error was harmless because the record as a whole reveals that the ALJ sufficiently considered these reasons where

20

they were relevant.  For example, at the hearing, the ALJ explicitly addressed any concern Silva might have had as to the harmful side effects of antidepressants, recently prescribed to her by NP Watkins, in March 2016.  See Tr. 56.  Further, it is unclear what side effects may be implicated by attending mental-health counseling, so this consideration was not relevant to Silva's failure to "follow-through" on referrals in April 2014.

The record also establishes that Silva had both adequate access to low-cost medical care and that she was aware of the need for such treatment.  For example, in March 2014, Silva was enrolled in an affordable treatment program at Horizons Counseling Center, upon her own request, but stopped attending after two sessions.  See Tr. 292, 318.  In January 2015, Silva saw her primary care provider ("PCP"), Rebecca Rose, for breast pain as a self-pay patient and complied with an order for a mammogram and an ultrasound.  See Tr. 327-332.  When asked by the ALJ why she had not seen a doctor or therapist since 2015, Silva replied that she "didn't bother" because she "found the Lord."  Tr. 38-39.[6]  Silva further stated that she kept her panic attacks under control, but decided to seek treatment in March

---

[6] According to the Joint Statement of Material Facts, Silva did not participate in any formal mental health treatment from April 2014 to March 2016.  Doc. No. 11 at 6.

2016 when she began to have an attack every day.  See Tr. 45.[7] In sum, to the extent the ALJ's omission of the aforementioned "reasons" from her decision was error, it was harmless because it is clear that the ALJ addressed the possible side effects of medication with Silva, that Silva could afford treatment when necessary, and that Silva had the mental capacity to seek treatment.  See Moore v. Comm'r of Soc. Sec., 573 Fed. App'x 540, 542-43 (6th Cir. 2014) (holding that claimant's failure to pursue treatment when the record indicates that she had the resources to afford treatment "greatly erodes her credibility"); Hanna v. Chater, 930 F. Supp. 378, 390-91 (N.D. Iowa 1996) (because the claimant had an ability to hire others to assist her in her daily life and much of her prescribed treatment required no expense, "the ALJ could have concluded her financial concerns were not severe enough to justify her failure to seek further treatment.").

## C.    Drug and Alcohol Abuse – Materiality Determination

Silva's principal argument is that the ALJ's determination that she would not be disabled if she stopped substance use was based on the false premise that her substance abuse was an active impairment during the period under review.  In other words, Silva challenges the ALJ's conclusion that her

---

[7] When Silva did seek treatment in March 2016, Mid-State Health assisted her in applying for Medicaid.  See Tr. 51.

22

polysubstance use was a "contributing factor material to the determination of disability," despite Silva's claim that she had been sober since her alleged onset date and an alleged lack of evidence to contradict that claim. She argues that because she was sober during the entire period in question, a two-year stretch in which her anxiety symptoms continued to worsen, the ALJ erred in finding her history of substance use material to the determination of disability. I reject her argument. The ALJ's materiality determination is supported by substantial evidence for the reasons discussed.

The Social Security Act, as amended, provides that an individual otherwise determined to be disabled, "shall not be considered disabled . . . if alcoholism or drug addiction . . . [is] a contributing factor material" to that determination. 42 U.S.C. § 423(d)(2)(C); Ell v. Berryhill, No. 16-cv-465-SM, 2018 WL 301159, at *3 (D. N.H. Jan. 5, 2018). Thus, if a claimant is determined to be disabled and there is medical evidence of substance abuse, then the ALJ "must go one step further" and determine whether substance abuse is a material factor contributing to the disability. Benelli v. Comm'r of Soc. Sec., No. 14-cv-10785, 2015 WL 3441992, at *22 (D. Mass May 28, 2015) (quoting Brown v. Apfel, 71 F. Supp. 2d 28, 35 (D. R.I. 1999)). In assessing materiality, the critical inquiry is "whether the Commissioner would still find the claimant disabled if he or she

stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1).

If the answer is no, then the claimant's DAA is material to the initial disability determination and he or she will ultimately be considered "not disabled" under the Act. See 20 C.F.R. § 404.1535; Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d Cir. 2012); Parra v. Astrue, 481 F.3d 742, 747-48 (9th Cir. 2007). If the answer is yes, then the opposite results. 20 C.F.R. § 404.1535.

In practice, this requires the ALJ to engage in the familiar five-step sequential analysis for a second time, while discounting the effects of the claimant's substance abuse. See Sax v. Colvin, 31 F. Supp. 3d 1156, 1161 (E.D. Wash. 2014); Lohmeier v. Colvin, No. CV-14-02247, 2016 WL 825850, at *8 (D. Ariz. Mar. 3, 2016); SSR 13-2p, 2013 WL 621536, at *4-6. His or her decision must address which impairments would remain in the absence of any substance abuse disorder, and whether those remaining impairments would be disabling either alone or in combination. 20 C.F.R. § 404.1535(b)(2); see SSR 13-2P, 2013 WL 621536, at *14. The burden of proving DAA immateriality, like the burden of proving disability, lies with the claimant. Cage, 692 F.3d at 123; SSR 13-2p, 2013 WL 621536, at *4. The question of materiality is reserved to the ALJ, and will be upheld so long as it is supported by substantial evidence. Benelli, 2015 WL 3441992, at *24 (citing Cage, 692 F.3d at 126-27).

24

With that framework in mind, I conclude that the ALJ's materiality determination is supported by substantial evidence. First, the record contains clear evidence of Silva's polysubstance abuse diagnoses by multiple medical sources. For example, on January 27, 2014, Silva was diagnosed with "sedative, hypnotic, or anxiolytic abuse," "alcohol dependence," and "cocaine dependence in remission" during a diagnostic assessment at the Genesis Behavioral Health clinic. Tr. 296. On April 14, 2014, Elsa Johnson, a counselor at Horizons Counseling Center wrote that Silva met the criteria for severe opioid, alcohol, and sedative use disorder. Tr. 299. Later, in June and October 2014, upon examination, Silva was again diagnosed by two different consultative psychologists with alcohol use disorder, anxiolytic use disorder, and opioid use disorder. Tr. 305, Tr. 325. Furthermore, Silva herself testified that she used to regularly use Oxycontin, cocaine, heroin, and Klonopin. Tr. 55. Although she claimed that she had not done so since January 2014, see Tr. 55, the ALJ was well-justified in finding "medical evidence of [her] drug addiction or alcoholism" and proceeding with the DAA evaluation as she did. See 20 C.F.R. § 404.1535(a); SSR 13-2P, 2013 WL 621536, at *10-11 (establishing the existence of DAA).

Moreover, despite Silva's claim of sustained sobriety, there is substantial evidence to support the ALJ's contrary

25

assessment.[8]  For example, on February 5, 2014, Angela

DeFabrizio, a treating social worker, spoke with Silva's

attorney after Silva cancelled a psychotherapy appointment.  Tr.

288.  Silva's attorney reported to DeFabrizio that Silva was

"currently drinking every day and may be engaging in cocaine."

Id.  Later that month, on February 21, DeFabrizio reported that

Silva's probation officer had informed her that Silva had failed

a drug test, testing positive for "opiates and barbiturates."

Tr. 283, 290.[9]  Nevertheless, on March 11, 2014, Silva informed

DeFabrizio that she had been "sober for a week."  Tr. 291.

Similarly, on April 14, 2014, Silva's counselor at Horizons

Counseling Center reported that Silva had "failed various

alcohol and urine screening due to relapsing," and opined that

---

[8] Although substantial evidence also supports Silva's claim that
her anxiety became more problematic as her sobriety progressed,
see Tr. 343, as well as her claim that she had been sober since
January 2014, see Tr. 299, 302, 320, this does not justify a
finding of reversible error as long as the ALJ's materiality
determination was supported by substantial evidence.  See
Benetti v. Barnhart, 193 Fed. App'x 6, 7 (1st Cir. 2006) (per
curiam) ("The ALJ's resolution of evidentiary conflicts must be
upheld if supported by substantial evidence, even if contrary
results might have been tenable also."); Mooney v. Shalala, 889
F. Supp. 27, 30 (D. N.H. 1994) ("[T]he possibility of drawing
two inconsistent conclusions from the evidence does not prevent
an administrative agency's finding from being supported by
substantial evidence.") (citing Consolo v. Fed. Mar. Comm'n, 383
U.S. 607, 620 (1966)).

[9] DeFabrizio further reported that Silva had failed to show up for
any scheduled "sobriety group" sessions that month.  Tr. 282-84,
290.

Silva's "anxiety is likely attribute[able] to her chronic substance abuse over the years." Tr. 299. On June 17, 2014 Silva presented to consultative licensed psychologist, Jessica Stern, and again reported that she had been sober since "the end of January" 2014. Tr. 302. Stern opined, however, that Silva was not "forthcoming" regarding her substance abuse issues and that it was "not clear . . . that she [was] in fact in remission." Tr. 304. She further opined that Silva's abilities germane to the work setting were impaired by her "substance abuse problems," *inter alia*. Tr. 305. All of these records and others were reviewed by Dr. Landerman on June 19, 2014, who rendered an opinion as to Silva's mental RFC at the time and concluded that she was "unable to adequately and consistently sustain" concentration, persistence, and pace, and "unable to maintain a regular full time work schedule." Tr. 74. In her assessment, Dr. Landerman opined that Silva's DAA could "not be factored out" given the evidence that she was in fact in remission. Tr. 75.

Second, the ALJ appropriately conducted the DAA evaluation to determine the materiality of Silva's substance abuse to her initial finding. The ALJ swiftly proceeded to step four of her second sequential analysis after finding that Silva's anxiety and depression persisted as severe impairments regardless of her substance abuse problems. See Tr. 25. In her non-DAA RFC

27

determination, the ALJ critically modified her prior, all-inclusive RFC to reflect only moderately impaired functioning once Silva's substance abuse was excluded from the analysis. Tr. 25; see Nickerson v. Colvin, 2017 D.N.H. 003, *3 (equating the ability to understand and carryout short, simple tasks and to sustain attention for two-hour periods with a moderate limitation). In constructing her non-DAA RFC, the ALJ relied exclusively on medical records from the period in which Silva's early remission was medically recognized by Dr. Burnette.

Specifically, the ALJ found that Silva "*could* sustain concentration and attention for 2-hours at a time for routine, familiar tasks," and "*could* persist[] at routine, familiar tasks at a variable, but acceptable pace" (emphasis added). Tr. 25. This significantly differed from previous, all-inclusive findings that Silva "[*could not*] sustain concentration and attention for even routine, familiar tasks for 2-hours at a time," "[*could not*] maintain a regular work schedule," and would be absent "at least two days per month" and "off task at least 15% of the workday." Tr. 23. Her non-DAA RFC also differed from the all-inclusive RFC in that it omitted any limitations pertaining to Silva's inability to maintain a regular work schedule or to expect excessive absences.[10]

---

[10] The rest of the limitations in the non-DAA RFC were also included in the all-inclusive RFC, namely abilities to only (i)

28

At step five, those changes measured the difference, in the opinion of the testifying VE, between a person who could and could not perform the representative jobs available for a person of Silva's age, education, and work experience. See Tr. 60-61. As the VE testified, the "15-percent-off-task" and "monthly absence" limitations would put such a person "beyond the [relevant] customary tolerances," and preclude her from performing those or any other jobs. Tr. 61. Thus, the ALJ's determination that Silva would not be disabled if she stopped the substance use and only had impairments of anxiety and depression was soundly reached.

Finally, the question then becomes whether the ALJ's non-DAA RFC was supported by substantial evidence. See Benelli, 2015 WL 3441992, at *24 (citing Cage, 692 F.3d at 126-27). I conclude that it was, particularly when considering Dr. Landerman's 2014 opinion. Generally, in configuring a non-DAA RFC, an ALJ can either draw from medical evidence from a period of sobriety, or rely on hypothetical, predictive evidence. See, e.g., Benelli, 2015 WL 3441992, at *23; see also Parra, 481 F.3d

---

"understand, recall and carry out short, simple instructions," (ii) "have occasional, brief interactions with the public," and (iii) "accommodate to routine, familiar changes." Compare Tr. 25; with Tr. 23 (all-inclusive RFC listing the same). In this respect, both RFCs essentially adopted either of the two mental RFCs of Dr. Landerman, which both reflected only moderate limitations in these areas. See Tr. 87-91.

at 748-49; SSR 13-2P, 2013 WL 621536, at *12.  One or the other is naturally required in order to separate out a claimant's remaining functional limitations once substance abuse is a nonfactor.  Here, the ALJ did the former: she adopted an expert opinion as to Silva's remaining limitations from a period in which her substance abuse was in early remission.  As discussed, Dr. Landerman's second RFC opinion was rendered during a period in which Silva's polysubstance abuse was in early remission, see Tr. 91, i.e. several diagnoses by Dr. Burnette on October 14, 2014.  Tr. 320-325.  Accepting that evidence, Dr. Landerman opined that Silva was "not significantly limited" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances."  Compare Tr. 90 with Tr. 88 (June 2014, all-inclusive RFC).  She further opined that she was "able to sustain concentration and attention for two hours for routine and familiar tasks."  Tr. 90-91.  Importantly, this differed from her previous June 2014 opinions that Silva was "moderately limited" in both functional areas, and that she was "unable to maintain a regular full time work schedule" and "unable to adequately and consistently" sustain concentration, persistence, and pace.  Tr. 88.  This earlier, more restrictive RFC from June 2014 considered the effects of Silva's polysubstance abuse, whereas the more recent, less restrictive opinion did not.

30

Thus, the ALJ's determination that if Silva remained sober, she would require no limitations as to her ability to maintain a regular work schedule is supported by Dr. Landerman's opinion. All other facets of the ALJ's non-DAA RFC, including Silva's ability "to sustain concentration and attention for 2-hours at a time for routine, familiar tasks," are plainly supported by Dr. Landerman's opinion because they were taken verbatim therefrom. See Tr. 89-91. Thus, the non-DAA RFC is indeed supported by substantial evidence, and I find no error.[11]

## V. CONCLUSION

For the reasons set forth above, I grant the Acting Commissioner's motion to affirm (Doc. No. 13), and I deny

---

[11] The ALJ also found that Silva's non-DAA RFC was consistent with the opinions of Dr. Burnette. This conclusion is also supported by substantial evidence, and Dr. Burnette's opinion only provides further support for the ALJ's materiality determination. For example, Dr. Burnette's treatment notes from his October 2014 examination of Silva indicate that "[t]here was absolutely no overt indication that [Silva] was alcohol or drug-intoxicated at the time of [his] evaluation," and she again reported being sober since January 2014. Tr. 320. He found Silva's mood to be "humorless and somewhat dysphoric, but not especially anxious," and although she "described panic like symptoms," Dr. Burnette did not actually observe any. Tr. 322. He opined that Silva was "able to understand and perform ordinary affairs of life such as providing for her own food budgeting money, housing, and clothing." Tr. 325. He also found that her anxiety and depression could "probably be better managed after about 6-8 months" with "competent, timely and aggressive treatment." Id.

31

Silva's motion to reverse and remand (Doc. No. 10).  The clerk

is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

August 3, 2018

cc:  Terry L. Ollila, Esq.
     D. Lance Tillinghast, Esq.